This morning is Pat Hatfield v. Secretary of Veterans Affairs, 2023-2280. Mr. Luck. Good morning, your honors. May it please the court. Adam Luck, appearing on behalf of Appellant Pat A. Hatfield. This case involves Ms. Hatfield's allegation of clear and unmistakable error in her 1980 board decision. And it presents the primary issue of whether a breach of the duty imposed on VA medical personnel in 1976 to obtain informed consent prior to rendering medical treatment constituted compensable negligence at the time of her 1980 board decision. Well, that wasn't part of the statute in 1980. Well, your honor, in 1980, as well as when it was enacted back in 1924, Section 351, as noted by the Veterans Court, was intended to afford veterans compensation for disability that arises through accident, carelessness, negligence, lack of proper skill, similar sense of fault, etc. on the part of any person charged with a duty respecting hospitalization or medical treatment. Now, how do we know who has a duty? How do we know what those duties are or the standard of those duties? That came in 1976, your honor, with the enactment of Section 4131, and then later when VA promulgated Section 1734. Well, this is a Q case, clear and unmistakable error. So you're sort of arguing inferences and pulling in other things. That's not clear and unmistakable error. Well, your honor, I think because it's complex doesn't necessarily mean it's undebatable. What is undebatable here is that Mr. Hatfield's treating physicians in 1978 had a duty to obtain his informed consent. It was a statutory and regulatory duty to obtain informed consent, to document that consent, to inform him of the risk of the procedures he was undergoing. And it's undisputed that his informed consent was not obtained. We know that from Appendix 99. The Secretary conceded that on page 3 of his brief. We also know it's undisputed that Section 351 was directed at any VA personnel charged with a duty. So when Congress enacted 4131, charging VA medical personnel with a duty to obtain informed consent, that brought that personnel under the umbrella that Section 351 was intended to compensate veterans for whenever there's a breach of those duties. You don't contest, as I understood your brief, that there has to be a showing that the action was negligence, right? At the time of when 351 was enacted, there was no requirement of – 351 is a causation. Right, but the regulations that were promulgated under 351 from way back required negligence, as I understand those regulations. Correct. That's the – And as applicable to this case, isn't it your burden here to show that it was clear and unmistakable that negligence of the sort that's covered by 351 and the regulations included failure to obtain informed consent? Correct, Your Honor. So Section 351 is – essentially says that if disability or death results from VA treatment, Section 3.358, the regulation you're referring to from way back when, was the proximate cause regulation requiring that the resulting disability or death be due to something like negligence, carelessness, lack of proper skill, et cetera. And Ms. Hatfield's argument is that the failure to obtain informed consent, the breach of the duty imposed by 4131 and 1734 was that negligence action, that proximate cause. And the law, as I understand it at the time in 1980, was in the process of moving from characterizing lack of informed consent as a form of battery in towards saying that it could be negligence. But that was a process that was in flow. It had not yet been achieved clear and unmistakable status as a form of negligence. Is that a fair characterization of where the law was at that time? A fair characterization from a medical standpoint, Your Honor. So some – I guess some states obviously recognized that as a battery. Some states recognized it as negligence. In Texas, for example, where Mr. Hatfield was treated, recognized it as negligence. But the duty, the breach of the duty is the negligent action. That's what we're arguing here, Your Honor, is not necessarily that there's this widespread acceptance in the medical community that – or even a standard of informed consent. But there's a regulatory and a statutory duty that was imposed on VA to comply with what VA has conceded is a longstanding requirement to obtain informed consent. So with that breach of that duty, that brings it under the umbrella. That's the connection between the duty imposed and the compensation for the breach of the duty imposed under 351. I had understood your answer to one of Judge Bryson's earlier questions to be you agree that we would have to find that as of 1980 it was undebatable that not only informed consent or lack of informed consent was negligence but that it was compensable negligence under the statutory and regulatory regime in place in 1980. That we'd have to find that's undebatable in order for you to prevail here. All of that including the compensable nature of the harm here. Are you agreeing that that is what we'd have to find? I do agree. So what authority can you cite on the compensable point that by 1980 it was undebatable as a legal matter under federal law that a veteran was entitled to compensation for this type of negligence? So the board and the Veterans Court, everyone's looking for this smoking gun. Point to one specific thing that says yes, breach of informed consent equals negligence. But what Hatfield is arguing is it was well recognized in 1980 that a breach of the duty imposed constituted negligence under 4131 and 1734. And that brought that negligence, the breach of the duty, within the realm of 351 and 3.358. Does that make sense? It makes sense, but I guess the question is have we said, I don't know that we've said clear and unmistakable error when you're alleging it's a legal interpretation like this that it necessarily requires a precedential finding of a court at the time. But I think we've at least suggested it requires something more than just an interpretation that you just gave of various statutes and regulations that may be right, it may be wrong, but it's hard for me to see how it's undebatably right. Well, what has not happened in this case is the Board has not addressed that and the Veterans Court has not addressed that. What the Board addressed is whether the express link between informed consent and compensation that came in Regulation 3.361 was present prior to 2004. And the Board said it wasn't because this came in 3.361. The Veterans Court said the same thing. It said that in 1924, lack of informed consent was not even contemplated. And it wasn't contemplated until 1995 when Section 3.361 first began its process, its road to promulgation. But we know that that is incorrect. And how do we know? It's because in 1994, VA's General Counsel issued a precedential opinion that links failure to obtain informed consent with the compensation provided under 3.3, excuse me, 351 and 3.358. So neither the Board nor the Veterans Court mentioned this VA General Counsel opinion. But what is notable about that opinion is it came before Section 3.361's express link. So it confirms there's already a link in place between failure to obtain informed consent and compensation under 351 and 3.358. So the whole Board's reasoning that 3.361's express consent was not available prior to 2004 is clearly incorrect. And when the Veterans Court talks about we're able to look at the law to interpret what was there or what was missing prior to 1980, we've got to talk about all the law. And the Board nor the Veterans Court talked about that, which clearly showed there is a link there. But a 1994 General Counsel opinion, even if you take that opinion as expressing clear law at that time, is 14 years after the events that this case turns on. So it doesn't seem to me a natural inference to say, well, if the General Counsel said in 1994 that this is a compensable injury, it must have been so in 1980. That's my problem with the General Counsel argument. Understood, Your Honor. The relevance of the 1994 VA General Counsel opinion is, A, like we just discussed, that it contradicts the Board's reasoning for denying Ms. Hatfield's claim. It contradicts the Veterans Court's citation that consent hadn't even been mentioned until afterwards. But it also supports Ms. Hatfield's interpretation of her allegation of Q in that there was a duty imposed on VA and VA breached that duty when it treated Mr. Hatfield and caused his death without obtaining informed consent. That's where Ms. Hatfield's reliance on the 1994 General Counsel opinion comes. The government, I'm sure you noticed, sent us the supplemental authority or decision recently in Cyphers. Are you still maintaining that something improper was done here by citing to post-1980 legal developments? Well, Your Honor, so obviously the footnote in Cyphers pretty much telegraphs this court's position on considering subsequent authority to interpret laws that stood under the relevant time. Ms. Hatfield may disagree with that, but that's the law that we have today. So I don't think that's no longer an issue that we will continue to pursue. Do you want to save the remainder of your time for a bottle? Yes, Your Honor. I believe I will use it. Absolutely. Thank you. Mr. Golden. Good morning, and may it please the Court. First, just to address the obvious, what happened with Mr. Hatfield was an undeniable tragedy. And as the Board said in 1980, there's deep sympathy for Mrs. Hatfield, and there's obviously the Board wishes that a different outcome had occurred. But as to this case today, as the Court correctly noted, the question is not whether or not some other regulation regarding developing doctor's practices mentions informed consent. The question is, what did the statute regarding compensation say in 1980 regarding when compensation was eligible, and when did it speak to informed consent? I do want to address one point that opposing counsel made regarding Appendix 99 and page 3 of the government brief, which he qualified as an admission that there was no informed consent. Just to be clear, documented informed consent is the exact language that was used in that situation. It wasn't regarding the potential informed consent. In the appendix, there are actually letters from Mrs. Hatfield from the 1970s that refer to radiologists talking to her and her husband, discussing a 95% chance of successful treatment. Obviously, we wish that had been the chance that it happened. But that gets to the facts. That gets to the application of laws to facts. And that was for the Board to do. Sitting here today, the question before this Court is, did the Veterans Court err as a matter of law in its decision affirming the Board's decision? Not the question of was there a factual question, but an application of Q error to the 1980 decision. That was a decision that the Board made. Based on that, we point to the fact that, as the Court noted, there is conflicting evidence. In our briefs, we cited some states that had decisions in the 1970s and the 1980s that found that there was no negligence for lack of informed consent. And here, we're looking at what the Board decided in 1918, putting ourselves in their shoes at the time they were making the decision. And I think one critical thing here is to look at that Board's decision in the appendix, specifically on pages 53 through 55, where the Board sought an independent medical expert and specifically asked the question, was the Veterans' care at the VA center otherwise within the bounds of accepted medical practice? And they received a response from the independent medical examiner, who was the head of oncology, I believe it was Albany University Medical School. The plan was fully appropriate in this patient. The complication of treatment was suspected early, diagnosed correctly, and treated properly. And so the question as to whether there was clear error, that the Board should have somehow in 1980 looked beyond an independent medical expert and its own medical experts, who both found the treatment was done properly, look beyond that decision to look for not whether there was informed consent, but whether there was a document in informed consent, despite no statutory or regulatory language telling them to do so. I don't think we can stand here today and say that no reasonable find or fact would have acted the way the Board did today, that it was clear, unmistakable error. The regulation on informed consent, setting aside the statute regarding 351, regarding compensation, I thought that had been prior to 1980, right? The regulation regarding the direction of the VA to develop methods of obtaining informed consent. I see. There was not a regulation dictating exactly how that was to be obtained? Is that what you're saying? So that comes into the VA's interpretive regulation, which did also come into effect, I believe, between the time of Mr. Hatfield's treatment and the Board's decision. I see. But again, that goes to the question of how do VA medical practitioners obtain and document this consent? It doesn't go to compensation. And would that interpretive regulation say the informed consent must be documented? I would need to look at the exact language at the time. I don't remember if it said documented or it just said obtained. I would have to double-check that one. But what I would say is that language said nothing to, and if you don't do this, then we go to Section 351. Then we go to compensation standard. In fact, that's why we eventually have to have 3.361, why that language has to come in and say, and remember this is in 3.361 D1, there are two subsections that say that a veteran is to get compensation when their medical treatment leads to further disability or death. The first one speaks to the VA failing to exercise the degree of care, and that's what the opposing counsel was talking about, that lack of informed consent fell to a lack of degree of care. But the second section is the one that says that the VA furnished the care without the veterans or the veterans' representatives' informed consent. It is a separate reason, separate from the lack of the failure for degree of care. The lack of informed consent is an entirely distinct, even in the statute today, reason why you'd get compensation. In the regulation. In the regulation, thank you. And when was that regulation? Remind me, when was that promulgated? I believe it was certainly far after 1980. I can't remember the exact date it came into play, but that's the regulation. Somewhere in the 1990s. I feel like 1997, I think, might have been. Shortly after the OJC's opinion. I want to double check before making any assertion to that point. But that is the regulation that's now been applied to Mrs. Hatfield's renewed claims. This is the reason why, as of 2021 and backdated to 2010, she is receiving compensation for what happened to Mr. Hatfield. That's the decision that's in the appendix right at the end. Not the Q decision, the reopened decision. Because now 3.361 does exist. And that goes back how far? It was backdated to 2010, which was when her claim was reopened. Right, and so she wants now to recover between 1980 and 2010. That's my understanding. That's where, if the court was to find on the Q, in her favor. But, again, the situation we find ourselves in now is putting ourselves in the board's shoes in 1980. As of 1980, though, you don't point to any authority that says lack of documented informed consent was not compensable negligence. Is that fair? That's fair. There's no such regulation that says do not compensate if these are the situations. Can you point to any authority from our court, or really any authority, that says when we're in a situation like that, it cannot be undebatable, and I apologize for all the negatives. What compels us to say that it is undebatable, given that there's really sort of an absence of authority at the time in 1980? Well, again, I was talking about a statutory authority. It's the regulatory authority that makes it undebatable. It is section 3.358c3, which says that compensation may not be payable for either the contemplated or foreseeable after results of approved medical or surgical care properly administered, no matter how remote, in the absence of showing, and then it lists the things that must be shown to get that compensation, and it has to be carelessness, negligence, lack of proper skill, error in judgment, or similar instances of indicated fault. Now, this is not the argument Mrs. Hatfield made, and the court can look to her brief before the VA, before the board, where the argument was solely the lack of documented informed consent is per se, by itself, reason for compensation. But the board was not looking at that. The board was looking at it, and again, this goes to why they sought, because I think it's important to point out the 1980 decision is their second bite of the apple. They remanded it the first time in January 1980 to develop. They requested the entire medical record. They requested the independent medical advice, so that they had every single piece of information they could have in front of them, frankly, from what it appears, to try and find something, to try and find something that would allow them under 351 to provide extra compensation. They were very sympathetic to her case, and again, the language there, they speak to, they even acknowledge in that final sentence, and I will point again to Appendix 59, that they expressly acknowledge the duty to find in the veteran and the appellant's favor, where possible, to rule any issue of doubt in her favor, but the evidence leaves us with no doubt. The care was done properly, and in that situation, 351 ties our hands, because we're only allowed to give this compensation. There are other compensations she may be entitled to, survivor's benefits, disability benefits, and so on. But this specific compensation for his tragic death as a result of a reaction to medical treatment, that requires, the statute says, Congress has told us, and the regulation has restricted us to only give it in certain circumstances, and there's nothing here in 1980 that fits this language. They were not considering lack of informed consent in that analysis, correct? They were not considering it expressly, but they were considering the standard of care. And they specifically asked these questions, was the veteran's care within the bounds of accepted medical practice? Now, the independent doctor did not come in and say the consent was obtained to its level, because he said the care was done to acceptable practice. It was treated properly. It was fully appropriate treatment. I fully agree with the policy they took, if not, and then it goes on to which treatments they did and did not do. And again, appendix 56, the chart indicates the therapy was indicated and was administered properly. Now, if we're talking about lack of care, if we're talking about that sort of situation, what's the accepted medical practice? If there is an issue where consent has not been obtained where medical practice requires it, that would have been in that report, as we understand it, or at least the board would have. I guess your view boils down to if it was truly undebatable in 1980 that you needed documented, informed consent, the board or their outside expert would have at least some mention of that somewhere, and the absence of it means it's at least debatable? It's at least debatable, and it's definitely debatable. It's also something that wasn't directly being presented to the board as an issue. Mrs. Hatfield, her briefs were in the appendix or her letters to the board, and they speak to the damage the treatment has done, whether she questioned whether it was the right treatment. But her letters speak of having discussions with the doctors about the treatment. She says, me and my husband were talked to by the radiologist. So to that degree, where would be the undebatable evidence that not only was there no informed consent, but on top of that, the informed consent was required by the statute, that there was an error that allowed compensation. It's a double level in that respect. And so on that front, since counsel has spoken to the Cyprus case and how that brings it, I don't know if the court needs us to address that. But the remaining argument in front of this court is simply the, it's not the Q argument, it's not whether Q applies in this case. It is whether or not it was error for the Court of Veterans Claims to not reverse the board for failing to agree repellent as to the implication of other statutes that concerned development of medical practices, but which did not teach talk to compensation. And I believe the key point there for the court member is, if Congress is wielding the pen in the 1970s and is creating new statutes to say informed consent is important, if Congress wanted that to also apply to compensation, specifically compensation for complications from death, as they have done since, Congress had that power and Congress chose not to do so. So to read that language in when it was specifically not included, we just don't see the grounds for doing so in this case. If the court has nothing further, I thank you for your time. Thank you, Counsel. Mr. Luck has some rebuttal time if he needs it. Thank you, Your Honor. Address a couple of questions that Judge Bryson asked to opposing counsel. One, 1734 was in place. It came at the time of the Veterans Treatment, I should clarify. It came after the treatment but was made effective in 1976, which evidences a strict liability view on VA's part to make it retroactive. Two, it does require that informed consent, in order to be informed consent, require that it be documented. Section 1734 outlines the standard for informed consent. It lists what must be disclosed, what must be documented, how that documentation must read. It has all these requirements in order for consent to be informed, to rise to the level of informed. So in response to the Secretary's argument that there's no undebatable error, there was a clear requirement to obtain informed consent in 1976. Statutory and regulatory had requirements to fulfill that were not fulfilled. That was promulgated in 76, did you say? I believe it was promulgated in 78, made retroactive in 76. Okay. But regardless, the duty to obtain informed consent was first enacted under 4131 in 1976. The standard upon which to determine informed consent, that's what Section 1734 addresses. I did also want to respond to the Secretary's argument about 3.358C3 requiring negligence. Ms. Hatfield's argument all along has been that her care was not properly administered because it was performed without obtaining informed consent prior to the treatment. And when the Secretary says that the Board relied on a medical opinion in 1980 that said the treatment rendered was proper, the only thing that that medical expert opined to was the dosage amount of the radiation that Mr. Hatfield received and said the dosage he received, the frequency he received it, the monitoring, the course of treatment, the follow-up care that was intended for chemotherapy, which he obviously never received, was a sound plan. And further stated in appendix 69 that the fatal pneumonitis that Mr. Hatfield suffered from is a known risk of radiation. So if it's a known risk of radiation and there's no indication that it obtained his informed consent, that it disclosed you could die within seven weeks of this treatment, despite a statutory and regulatory requirement to do so, that is clear. They should have obtained that consent. That consent should have been documented by statute and regulation. There is certainly no evidence at the time of the Board's decision that indicates Ms. Hatfield or the veteran was under the impression that death could have resulted from this treatment. We know this from appendix 65, 67, and 71, where Ms. Hatfield's statements are expressing complete confusion or puzzling about how the veteran could have died. Well, if she was told that you could die from this in seven weeks, there wouldn't be that confusion. They'd say this is a known risk. This obviously was a known risk as opined by the medical experts at the time of the 1984 decision. Counsel, your time has ended. Thank you for your argument, and the case is submitted.